IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

HERBERT W. PERKINS,     :
                               :
    Plaintiff,           :
                               :
    v.                 :     CIVIL ACTION NO.
                               :     1:14-CV-1067-RWS
MICHAEL C. THRASHER,     :
                               :
    Defendant.       :
                               :
                               :
                               :

## ORDER

This case comes before the court on Defendant Michael C. Thrasher's

Motion for Summary Judgment [42].  After reviewing the record, the Court

enters the following Order.

## Background

This case arises out of Plaintiff Herbert Perkins' arrest for obstruction

while outside of the Clayton County Police Department ("CCPD")

headquarters.  On March 7, 2012, Defendant, a Sergeant with the CCPD, exited

the CCPD headquarters where he observed Plaintiff walking in the parking lot.

(Def.'s Statement of Mat. Facts ("SMF"), Dkt. [44] ¶ 1, 3; Pl.'s SMF, Dkt. [55-

2] ¶ 1, 3.)  Most of the facts that follow are in dispute.

According to Defendant, Plaintiff was walking slowly around a section of the parking lot where only CCPD employees park and was looking inside and around the vehicles.  (Def.'s SMF, Dkt. [44] ¶ 3.)  Because Defendant did not recognize Plaintiff, and because he was aware of recent thefts involving police vehicles and equipment, Defendant decided to watch Plaintiff while he walked to his police car.  (Id. ¶ 3-4.)  As Defendant was getting in his police car, he claims that Plaintiff looked in his direction, stopped looking in and around the cars, and began walking away from the building in a purposeful manner.  (Id. ¶ 5.)  Then, after Defendant drove out of the parking lot and it appeared to Defendant that Plaintiff could no longer see Defendant's police car, Defendant claims that Plaintiff went back to wandering around the parking lot and looking into cars.  (Id. ¶ 6.)  Defendant continued watching Plaintiff and contends that Plaintiff eventually noticed.  (Id. ¶ 7.)  According to Defendant, Plaintiff then "ducked down" and disappeared from Defendant's view only to "pop up" two or three cars down the parking row and to begin walking quickly toward the street and out of the parking lot.  (Id.)

Plaintiff's version of what took place in the parking lot is quite different.

2

First of all, Plaintiff admits that he was walking around the parking lot, but claims that he was simply there to pick up his own car—a Kia.  (Pl.'s SMF, Dkt. [55-2] ¶ 3.)  At the time, Plaintiff's wife was an employee at the CCPD headquarters.  (Pl.'s Decl., Dkt. [55-3] ¶ 3.)  On that morning, Plaintiff had driven his wife's truck to the dealership for maintenance and his wife had taken Plaintiff's Kia to work.  (Id. ¶ 5.)  When the service on his wife's truck was complete, Plaintiff drove it to the CCPD headquarters to leave it in the parking lot and to pick up his own Kia.  (Id. ¶ 7.)  Plaintiff's wife had not, however, driven straight to the CCPD headquarters that morning.  (Id. ¶ 6.)  Instead, she went to the Clayton County Board of Commissioner's office where she attended an award ceremony.  (Id.)  So, after walking around the parking lot for a few minutes, Plaintiff could not find his Kia.  (Id. ¶ 12.)  He tried to call his wife to find out where she was, but she did not answer.  (Id.)  Plaintiff claims that he then went back to the truck and began to leave the parking lot to drive home.  (Id. ¶¶ 13-14.)  He disputes having ever noticed Defendant watching him or that he "ducked down" to disappear from Defendant's view.  (Pl.'s SMF, Dkt. [55-2] ¶¶ 6-7.)

As Plaintiff was leaving the parking lot, Defendant realized that he was

walking to the truck and began driving toward Plaintiff to prevent him from exiting the parking lot.  (Def.'s SMF, Dkt. [44] ¶ 8; Pl.'s SMF, Dkt. [55-2] ¶ 8.)  Plaintiff entered the truck, so Defendant pulled his vehicle at an angle in front of it, exited his police car, and yelled for Plaintiff to stop.  (Id.)  Plaintiff stopped.[1]  (Id.)

The nature of the initial encounter between the parties is heavily disputed.  According to Defendant, it went as follows.  Plaintiff immediately began talking in a loud voice and questioning why Defendant stopped him.  (Def.'s SMF, Dkt. [44] ¶ 9.)  Defendant then asked Plaintiff to calm down and to move the truck back along the curb where it had originally been parked so that he would not block the driveway to the parking lot.  (Id. ¶ 10.)  Plaintiff moved the truck but did not calm down.  (Id.)  Defendant "requested that Plaintiff provide an explanation for why he was in the area of the CCPD parking lot where the employees park, but Plaintiff would not answer [Defendant's] questions and remained in an agitated, hostile state."  (Id. ¶ 11.)

---

[1] There is some dispute as to whether Plaintiff stopped immediately, (Pl.'s SMF, Dkt. [55-2] ¶ 8), or "tried to nose around [Defendant's] car but could not and then stopped the truck."  (Def.'s SMF, Dkt. [44] ¶ 8.)  But Defendant admits in his reply to Plaintiff's statement of material facts that such a dispute is immaterial. (Def.'s Reply to Pl.'s SMF, Dkt. [65] ¶ 8.)

Fearing that Plaintiff might become violent and suspecting that Plaintiff had been trying to break into cars in the CCPD parking lot, Defendant told Plaintiff that if he did not explain why he was there and what he was doing he would be arrested for loitering.  (Id. ¶ 12.)  Plaintiff then began to give inconsistent and confusing statements about where his wife worked, including a statement that she worked for CCPD.  (Id. ¶ 13.)  Because Defendant thought that Plaintiff was acting in a hostile and disrespectful manner, Defendant did not believe Plaintiff's statement.  (Id. ¶ 14.)  As a result, he attempted to verify it by asking for the name of Plaintiff's wife.  (Id.)  Plaintiff initially refused to provide his wife's name and failed to give a sufficient reason for his presence in the CCPD parking lot.  (Id.)  Eventually, Plaintiff did provide his wife's name.  (Id.)

Plaintiff, on the other hand, claims that the initial encounter went as follows.  After stopping him, Defendant told Plaintiff he needed to provide a lawful explanation for why he was walking around the CCPD headquarters parking lot.  (Pl.'s Decl., Dkt. [55-3] ¶ 18.)  Plaintiff explained that he was looking for his Kia and that his wife worked in the CCPD headquarters.  (Id. ¶ 19.)  Plaintiff admits that he was "loud," but disputes Defendant's contention that he was "hostile."  (Pl.'s SMF, Dkt. [55-2] ¶ 11.)  Even though Defendant

AO 72A
(Rev.8/82)

did not believe Plaintiff's explanation, Plaintiff continued trying to explain that

his wife was probably still at the Clayton County Commissioner's office.  (Pl.'s

Decl., ¶ 20.)  Defendant then began "verbally jabbing" Plaintiff about not

knowing where his wife worked and suggested that Plaintiff was lying.  (Id.)

Defendant made no effort to confirm that Plaintiff's wife worked at the CCPD

headquarters.  (Id. ¶ 21.)

  At this point in the events, Defendant glanced at his patrol car, realized

that his in-car video camera was not on, and returned to the car and activated

the camera.  (Def.'s SMF, Dkt. [44] ¶ 15; Pl.'s SMF, Dkt. [55-2] ¶ 15.)  The

Court has reviewed the resulting video and will rely on it, where appropriate, in

describing the remaining facts.  Given certain limitations, however, such as the

camera angle and the clarity of the audio, the Court will continue to rely on the

parties' statements of material facts and the record evidence when the video is

unclear.

  After turning on the camera on his police car, Defendant returned to the

passenger side of Plaintiff's truck.  (Disc 1 File KSI-03/07/2012 08:17:56 #1 at

00:54, Dkt. [46].)[2]  Shortly thereafter, Defendant received information from dispatch that Plaintiff "was familiar for obstruction, battery on police, and for having a firearms permit."  (Def.'s SMF, Dkt. [44] ¶ 16; Pl.'s SMF, Dkt. [55-2] ¶ 16; see also Video at 01:48-54.)  At that point, Defendant asked Plaintiff if he had any weapons in the truck.  (Video at 01:54-55.)  Plaintiff responded "no, I do not have a gun with me, but I do have a permit."  (Id. at 01:56.)  Defendant claims that as Plaintiff made this statement, he looked down at his jacket. (Def.'s SMF, Dkt. [44] ¶ 17.)  Plaintiff denies this, (Pl.'s SMF, Dkt. [55-2] ¶ 17), and the video cannot resolve this dispute because the lighting is such that Plaintiff cannot be seen through the truck's windshield.  (See Video at 1:59.)

In any event, Defendant reacted by crossing in front of the truck to the driver side door.  (Id. at 2:02-2:09.)  Defendant then opened the driver side door and instructed Plaintiff to step out.  (Id. at 2:11.)  Plaintiff reacted by saying "wait a minute, excuse me, are you searching my car?"  (Id. at 2:11-13.) At the same time, it appears that the door of the truck closes slightly before reopening again.  (Id.)  Defendant claims that this is because Plaintiff tried to

---

[2] For the remainder of this Order, the Court will cite to the video as "Video," with a pincite indicating the time in the video when the cited event takes place.

AO 72A
(Rev.8/82)

pull the door shut, but Plaintiff disputes this.  (Def.'s SMF, Dkt. [44] ¶ 19; Pl.'s SMF, Dkt. [55-2] ¶ 19.)  Defendant then told Plaintiff that he was going to pat him down, at which point Plaintiff exited the truck and repeatedly said "pat me down."  (Video at 2:14-19.)  Next, Defendant told Plaintiff to "turn around" and to "place [his] hands on the car."  (Id. at 2:17-18.)  Plaintiff complied.  (Id.)  Then, as Defendant began the pat down, Plaintiff yelled "whoa, whoa" and lifted his left hand off the side of the truck.  (Id. at 2:20-21.)  At this point in the video, the truck's open driver side door stands between the camera and the parties, blocking the view.  Thus, all of the events that follow Plaintiff lifting his hand off the truck are either difficult or impossible to see.

According to Plaintiff, he lifted his hand off the truck because Defendant "hit [Plaintiff] in the groin which caused [Plaintiff] to buckle."  (Pl.'s SMF, Dkt. [55-2] ¶ 21.)  Defendant offers no explanation for Plaintiff's movement, but claims that he did not know whether Plaintiff was trying to escape, reach for a weapon, fight, or just resist the pat-down.  (Def.'s SMF, Dkt. [44] ¶ 21.)  As a result, Defendant "pushed his weight into Plaintiff, pushing him into the car; grabbed Plaintiff's arm; swept his legs out from under him and took him to the ground."  (Def.'s SMF, Dkt. [44] ¶ 21; Pl.'s SMF, Dkt. [55-2] ¶ 21.)  Once

8

Plaintiff was on the ground, Defendant handcuffed him and arrested him for obstruction. (Def.'s SMF, Dkt. [44] ¶ 21-22; Pl.'s SMF, Dkt. [55-2] ¶ 21-22.) Later in the video, after Plaintiff was in custody, Defendant asked him "why did you pull away when I was trying to pat you down?" (Video at 5:02-04.) Plaintiff responded "because you grabbed my private area." (Video at 5:05-07.)

On March 28, 2012, Plaintiff was charged with one count of misdemeanor obstruction. (Def.'s SMF, Dkt. [44] ¶ 24; Pl.'s SMF, Dkt. [55-2] ¶ 24.) The accusation was twice amended to add one count of disorderly conduct, a second count of misdemeanor obstruction, and one count of loitering. (Id.) On August 29, 2012, Plaintiff was found not guilty of all charges. (Id.)

Plaintiff's Complaint [1-2] raises three claims under 42 U.S.C. § 1983: false arrest; malicious prosecution; and excessive force. It also raises three claims under Georgia state law: malicious arrest, malicious prosecution, and false imprisonment. Defendant filed his Motion for Summary Judgment [42] on October 15, 2015.

AO 72A
(Rev.8/82)

**Discussion**

## I.     Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'"  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome

10

AO 72A
(Rev.8/82)

of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But the court is bound only to draw those inferences that are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

11

## II.    Analysis

### A.    Plaintiff's Section 1983 Claims

Plaintiff brings three claims against Defendant under 42 U.S.C. § 1983: (1) false arrest; (2) malicious prosecution; and (3) excessive force.  Defendant argues that he is entitled to qualified immunity as to all three.  (Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s MSJ Br."), Dkt. [43] at 7-21.)

The doctrine of qualified immunity protects government officials performing discretionary functions from being sued in their individual capacities.  Wilson v. Layne, 526 U.S. 603, 609 (1999).  Officials are shielded "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority."  Cottone v. Jenne, 326 F.3d 1352, 1357 (11th Cir. 2003).  Once the government official has satisfied this initial burden, the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity.  Id. at 1358.

To begin, the Court concludes that Defendant was acting within his

12

discretionary authority as a police officer when he stopped Plaintiff, conducted the pat-down, and arrested him.  "Discretionary authority includes all acts of a governmental official that were (1) undertaken pursuant to the performance of his duties and (2) within the scope of his authority."  Howell v. City of Lithonia, 397 F. App'x 618, 620 (11th Cir. 2010) (citing Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994)).  "Carrying out an investigatory stop and making an arrest are quintessentially discretionary acts of law-enforcement officials."  Townsend v. Coffee Cty., Ga., 854 F. Supp. 2d 1345, 1356 (S.D. Ga. 2011).  Because Defendant has established that he was acting within his discretionary authority, the burden shifts to Plaintiff to show that Defendant is not entitled to qualified immunity.  Oliver v. Fiorino, 586 F.3d 898, 905 (11th Cir. 2009) (citing McCullough v. Antolini, 559 F.3d 1201, 1205 (11th Cir. 2009)).

Now that the burden is on Plaintiff, the question of qualified immunity is decided through a two-step inquiry: the first inquiry is "whether the plaintiff's allegations, if true, establish a constitutional violation."  Barnett v. City of Florence, 409 F. App'x 266, 270 (11th Cir. 2010) (citing Hope v. Pelzer, 536 U.S. 730, 736 (2002)).  If the facts, construed in the light most favorable to the

13

plaintiff, show the violation of a constitutional right, then the second inquiry

"is whether the right violated was 'clearly established.'" Id. (quoting Saucier v.

Katz, 533 U.S. 194, 201 (2001)).  "Both elements of this test must be present

for an official to lose qualified immunity, and this two-pronged analysis may be

done in whatever order is deemed most appropriate for the case."  Id. (citing

Pearson v. Callahan, 555 U.S. 223, 236 (2009)).  Because Plaintiff brings three

Section 1983 claims against Defendant, the Court will conduct the remainder of

the qualified immunity analysis as to each claim in turn.

### 1.   *False Arrest*

Plaintiff first alleges that Defendant violated his Fourth Amendment

rights by arresting him for obstruction without probable cause to believe that

Plaintiff committed a crime.  (Compl., Dkt. [1-2] ¶¶ 54-58.)  "Plainly, an arrest

without probable cause violates the right to be free from an unreasonable

search under the Fourth Amendment."  Durruthy v. Pastor, 351 F.3d 1080,

1088 (11th Cir. 2003); see Skop v. City of Atlanta, 485 F.3d 1130, 1137 (11th

Cir. 2007) (noting that the reasonableness of an arrest is determined by the

presence or absence of probable cause).  "Probable cause to arrest exists when

law enforcement officials have facts and circumstances within their knowledge

14

sufficient to warrant a reasonable belief that the suspect had committed or was

committing a crime." Skop, 485 F.3d at 1137.

While the standard for a false arrest claim itself is probable cause, "[t]o

receive qualified immunity, an officer need not have actual probable cause, but

only 'arguable' probable cause." Brown v. City of Huntsville, 608 F.3d 724,

734 (11th Cir. 2010).  "Arguable probable cause exists where 'reasonable

officers in the same circumstances and possessing the same knowledge as the

Defendants could have believed that probable cause existed to arrest Plaintiff.'"

Id. (quoting Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir.

2004)).  Whether an officer possesses probable cause or arguable probable

cause depends on the elements of the alleged crime and the operative fact

pattern.  See Crosby v. Monroe Cty., 394 F.3d 1328, 1333 (11th Cir. 2004).

As an initial matter, Defendant correctly points out that an officer is

entitled to qualified immunity if he has probable cause to arrest the suspect for

*any* offense.  See Durruthy, 351 F.3d at 1089 n.6.  Nonetheless, Defendant only

argues that he had arguable probable cause to arrest Plaintiff for the crime of

obstruction.  (See Def.'s MSJ Br., Dkt. [43] at 11, 14; Def.'s Reply Br. in Supp.

of Mot. for Summ. J. ("MSJ Reply Br."), Dkt. [64] at 6-7, 8.)  For this reason,

the Court will only discuss arguable probable cause in the context of obstruction.

Plaintiff was arrested for the misdemeanor charge of obstruction under O.C.G.A § 16-10-24(a).  That statute says that "a person who knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties is guilty of a misdemeanor."  O.C.G.A. § 16-10-24(a).  Defendant contends that he had arguable probable cause to arrest Plaintiff under that statute for two reasons.

First, Defendant points to Plaintiff's movement during the pat-down. (Def.'s MSJ Br., Dkt. [43] at 11, 14.)  What took place during the pat-down, however, is disputed.  Defendant claims that he began the pat-down and then Plaintiff "attempted to turn around," which Defendant perceived as resisting. (Id. at 11.)  Plaintiff, on the other hand, claims that Defendant intentionally hit Plaintiff in the groin, which caused Plaintiff to buckle.  (Pl.'s SMF, Dkt. [55-2] ¶ 21.)  Importantly, the video cannot not resolve this dispute.  Because the parties are at the extreme right side of the frame during the pat-down, and because the open driver side door stands between the camera and the parties, the Court cannot discern precisely what happened during the pat-down.  What

16

*is* clear from the video is that Plaintiff at least initially consented: he repeatedly said "pat me down" and obeyed when Defendant asked him to "turn around" and to "place [his] hands on the car." (Video at 2:14-18.) The video reveals less as the pat-down proceeded because at that point Defendant is entirely outside of the frame. Just a moment after the pat-down began, Plaintiff yelled "whoa, whoa" and appears to have lifted his left hand off the side of the truck. (Id. at 2:21.) It is unclear from the video why Plaintiff moved.

Again, at this stage, the Court must view the facts in the light most favorable to Plaintiff, the non-moving party. See Patton, 277 F.3d at 1296; Barnett, 409 F. App'x 266 at 270. It is not clear whether Plaintiff moved during the pat-down on his own accord or because Defendant struck him in the groin. If it was the latter, then Defendant had no arguable probable cause to arrest Plaintiff for obstruction. No reasonable officer could believe that he had probable cause to arrest someone for obstructing a pat-down when the officer himself caused the supposed "obstruction." Because there is a genuine dispute of material fact as to the cause of Plaintiff's movement and the Court must construe the facts in a light most favorable to Plaintiff, the Court cannot conclude as a matter of law that Defendant had arguable probable cause to

arrest Plaintiff on the basis of that movement.

Second, Defendant argues that he had arguable probable cause to arrest Plaintiff for obstruction simply because Plaintiff "refused to answer [Defendant's] questions, was argumentative and belligerent, and was being stubborn and obstinate." (Def.'s MSJ Reply Br., Dkt. [64] at 7.) To support this position, Defendant cites Georgia case law holding that "violence or forcible resistance is not required to prove that an officer was hindered or obstructed in a misdemeanor obstruction case. Argument, flight, stubborn obstinance, and lying are all examples of conduct that may satisfy the obstruction element." Pinchon v. State, 516 S.E.2d 537, 538 (Ga. Ct. App. 1999). But even considering this language, the Court is not convinced that arguable probable cause existed to arrest Plaintiff for obstruction.

Plaintiff was no doubt upset, but he remained compliant throughout the encounter. Plaintiff tried—multiple times—to explain that he was only in the CCPD headquarters parking lot because his wife worked there and he was looking for his car. And Defendant clearly understood Plaintiff's explanation because his first comment to Plaintiff after the video begins is "so your wife is Patricia Perkins, [and] she works in here?" (Video at 11:54-56.) As further

18

evidence of his compliance, Plaintiff responded candidly and clearly when
Defendant asked him whether he had any weapons in the truck.  (Id. at 01:56-
57.)  He also consented to the pat-down when Defendant opened Plaintiff's
door and asked him to step out and to place his hands on the truck.  (Id. at 2:15-
20.)  Compliance of this sort is distinct from conduct that Georgia courts have
identified as misdemeanor obstruction.  See Mayhew v. State, 682 S.E.2d 594,
598 (Ga. Ct. App. 2009) (finding sufficient evidence of obstruction where the
defendant repeatedly refused to obey the officer's verbal commands to calm
down and to step back from where the officer was interviewing the victim);
Harris v. State, 622 S.E.2d 905, 907 (Ga. Ct. App. 2005) (same where the
defendant disobeyed the officer's lawful commands "to wait and to back off");
see also Johnson v. State, 766 S.E.2d 533, 535-36 (Ga. Ct. App. 2014)
(collecting cases where speech alone constituted obstruction).  For that reason,
the Court cannot conclude as a matter of law that Defendant had arguable
probable cause to arrest Plaintiff for obstruction based on his interactions with
Plaintiff before the pat-down.

        In summary, taking the facts in the light most favorable to Plaintiff, the
Court cannot conclude that Defendant had arguable probable cause to arrest

Plaintiff based on his conduct either before or during the pat-down. As a result, Defendant's actions, under Plaintiff's version of the events, would constitute a violation of Plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures. See Durruthy, 351 F.3d at 1088. And that right was clearly established at the time that Defendant arrested Plaintiff. See Skop, 485 F.3d at 1143 ("[O]ur binding precedent clearly established . . . that an arrest made without arguable probable cause violates the Fourth Amendment's prohibition on unreasonable searches and seizures."). So Defendant is not entitled to qualified immunity and the Court must **DENY** summary judgment as to Plaintiff's Section 1983 claim for false arrest (Count 1).

### 2.    *Malicious Prosecution*

Plaintiff's next claim against Defendant is for malicious prosecution in violation of the Fourth Amendment. (Compl., Dkt. [1-2] ¶¶ 59-65.) "[T]o establish a federal malicious prosecution claim under § 1983, a plaintiff must prove (1) the elements of the common law tort of malicious prosecution, and (2) a violation of [his] Fourth Amendment right to be free from unreasonable seizures." Kingsland v. City of Miami, 382 F.3d 1220, 1234 (11th Cir. 2004).

20

The common law elements include: "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." Wood v. Kesler, 323 F.3d 872, 882 (11th Cir. 2003).

Defendant's sole argument in favor of summary judgment on Plaintiff's malicious prosecution claim is that the undisputed facts show that Defendant had probable cause to arrest Plaintiff for obstruction. (Def.'s MSJ Br., Dkt. [43] at 15-16.) Indeed, Defendant insists that "the analysis [of Plaintiff's malicious prosecution claim] is the same as that for a § 1983 false arrest claim." (Id. at 14.) As a result, Defendant rests his success on the malicious prosecution claim on his success on the false arrest claim. But because the Court found that, viewing the facts in the light most favorable to Plaintiff, Defendant would not have had probable cause to arrest Plaintiff for obstruction in Part II.A.1., *supra*, it must also reject Defendant's argument as to Plaintiff's malicious prosecution claim. The Court therefore **DENIES** Defendant summary judgment as to Plaintiff's Section 1983 malicious prosecution claim (Count 2).

### 3. Excessive Force

Finally, Plaintiff raises a Fourth Amendment excessive force claim against Defendant for "using force against a citizen without arguable probable cause to believe that the citizen committed or was committing a crime." (Compl., Dkt. [1-2] ¶ 68.)  Defendant argues that he is entitled to summary judgment on this claim because it is subsumed by Plaintiff's false arrest claim.

"[W]here an excessive force claim is predicated solely on allegations the arresting officer lacked the power to make an arrest, the excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest claim." Bashir v. Rockdale Cty., 445 F.3d 1323, 1332 (11th Cir. 2006).  That is precisely the case here.  Plaintiff's excessive force claim depends on his contention that it was improper for Defendant to use any force against him because Defendant lacked arguable probable cause to believe that Plaintiff had committed a crime.  (See Compl., Dkt. [1-2] ¶¶ 66-69; Pl.'s MSJ Opp'n Br., Dkt. [55-1] at 17-18.)  Because Plaintiff's excessive force claim is not "discrete," Bashir, 445 F.3d at 1332, Defendant's Motion for Summary Judgment [42] is **GRANTED** as to that claim (Count 3).  The Court notes, however, that Plaintiff may still recover the damages suffered because of

22

Defendant's use of force through his false arrest claim.  See id. ("[T]he damages recoverable on an unlawful arrest claim 'include damages suffered because of the use of force in effecting the arrest.'") (quoting Williamson v. Mills, 65 F.3d 155, 158 (11th Cir. 1995)).

      B.     Plaintiff's State Law Claims

      Plaintiff also brings three state law claims against Defendant: malicious arrest under O.C.G.A. § 51-7-1 (Count 4); malicious prosecution under O.C.G.A. § 51-7-40 (Count 5); and false imprisonment under O.C.G.A. § 51-7-20 (Count 6).  (Compl., Dkt. [1-2] ¶¶ 70-74; 75-79; 80-84.)  Defendant argues that he is entitled to summary judgment on all of these claims.  (Def.'s MSJ Br., Dkt. [43] at 21-23.)  Plaintiff offers no argument in response.  Instead, he merely asks the Court to dismiss his state law claims without prejudice.  (Pl.'s MSJ Opp'n Br., Dkt. [55-1] at 19 n.10.)  The Court declines to do so.  Plaintiff had ample opportunity to prosecute his state law claims in this case, but failed to do so by not responding to Defendant's arguments on summary judgment.  For that reason, Defendant's Motion for Summary Judgment [42] is **GRANTED** as to all of Plaintiff's state law claims (Counts 4-6).  Those claims are therefore **DISMISSED with prejudice**.

23

### Conclusion

For the reasons above, Defendant's Motion for Summary Judgment [42] is **GRANTED in part and DENIED in part**.  It is **GRANTED** as to Plaintiff's Section 1983 claim for excessive force (Count 3) as well as his state law claims for malicious arrest (Count 4), malicious prosecution (Count 5), and false imprisonment (Count 6).  It is **DENIED** as to Plaintiff's Section 1983 claims for false arrest (Count 1) and malicious prosecution (Count 2), as well as his derivative claims for punitive damages (Count 7) and attorney's fees (Count 8).

**SO ORDERED**, this 30th day of August, 2016.

_____
**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)